IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

RLI INSURANCE COMPANY,  §
                        §
          Plaintiff,    §
                        § Civil Action No. 3:04-CV-0635-D
VS.                     §
                        §
PHILADELPHIA INDEMNITY  §
INSURANCE COMPANY, et al., §
                        §
          Defendants.   §

MEMORANDUM OPINION
AND ORDER

In this coverage dispute among insurance companies arising from the settlement of a state-court wrongful death lawsuit, the court must make an *Erie*-guess concerning how the Texas Supreme Court would decide an issue of stacking of insurance policies and would allocate liability among four policies provided by three insurance carriers, each of whom moves for summary judgment.

I

This is a diversity action in which plaintiff RLI Insurance Company ("RLI") sues defendants Philadelphia Indemnity Insurance Company ("PIIC") and USF Insurance Company ("USF") to recover part of what it paid to settle a lawsuit filed against its insured, BMW Healthcare, Inc. ("BMW"). RLI alleges that it contributed a disproportionate share of the settlement proceeds because neither PIIC nor USF tendered the full amount it was obligated to contribute. RLI sues for equitable and/or contractual subrogation and contribution, breach of contract, and negligence, and it seeks

attorney's fees.

The facts are substantially undisputed.[1]   BMW is in the business of operating nursing home facilities, including Westridge Manor ("Westridge").   BMW was sued in *Tutt v. BMW Healthcare, Inc.* ("*Tutt* Lawsuit")[2] arising from the death of Payton Moore ("Moore"), a Westridge resident from November 12, 1998 to November 21, 1999. The *Tutt* plaintiffs alleged that BMW had negligently caused Moore's injuries and death by providing a continuing course of substandard, improper care throughout the duration of his residency at Westridge.

PIIC insured BMW d/b/a Westridge under a commercial general liability ("CGL") insurance policy ("PIIC Primary Policy") for the period October 1, 1998 to October 1, 1999, with primary policy limits of $1 million per occurrence.   PIIC also insured BMW under a commercial excess liability policy ("PIIC Excess Policy") for the same period, with excess liability limits of $1 million per occurrence.   Westridge was a covered facility under both PIIC Policies throughout the Policies' periods.

On August 25, 1999 PIIC mailed BMW notices that it would not renew the Policies.   The notices of non-renewal indicated that the policy expiration dates for both the PIIC Primary Policy and the

---

[1]In deciding these motions, the court relies on the parties' July 27, 2005 stipulation of facts.

[2]*Tutt v. BMW Healthcare, Inc.*, No. 2001-389 (4th Dist. Ct., Rusk County, Tex.).

PIIC Excess Policy would be extended to October 28, 1999.  PIIC also attached a "Policy Change Form" to the PIIC Primary Policy. This form stated: "In Consideration of No Change in Premium the Policy is Being Amended as Follows: The Policy Expiration Date Should Read 10-28-99 in Lieu of 10-1-99.  All Other Terms and Conditions Remain the Same."  Stipulation of Facts 2.  PIIC provided the coverage extension on its own initiative and for no additional premium to ensure that BMW would be provided with 60 days' notice of non-renewal.  BMW neither requested the coverage extensions nor paid additional premiums.

At the time PIIC mailed the non-renewal notices, BMW was insured under a primary CGL policy provided by USF ("USF Policy") that covered the period March 18, 1999 to March 18, 2000, with policy limits of $1 million per occurrence.  BMW was also insured under a commercial umbrella liability policy provided by RLI ("RLI Policy") for the period March 18, 1999 to March 18, 2000, with umbrella liability limits of $5 million.  The Westridge facility was not covered by either policy.  Effective October 1, 1999 Westridge was added as an insured location to both the USF Policy and the RLI Policy.

BMW, RLI, USF, and PIIC settled the *Tutt* Lawsuit in 2003 for $3.9 million.  During settlement negotiations, two disputes arose among the insurers.  First, RLI and PIIC disputed the *Tutt* Lawsuit's settlement value.  RLI valued the settlement at $3.9

million, and PIIC valued it at $3.7 million.  Both RLI and PIIC now concede that the other company's valuation was reasonable.  They also agree that, because the PIIC Excess Policy had limits of $1 million and the RLI Policy had limits of $5 million, any excess coverage beyond the primary policy limits is to be allocated between the excess policies at a ratio of five-to-one.  Second, RLI, PIIC, and USF disputed how the settlement amount was to be allocated.  RLI contended that PIIC and USF should each contribute the full $1 million limits of their respective primary policies.  PIIC and USF maintained that they should each pay $500,000 on their primary policies to meet the $1 million total primary liability limits.

Each party reserved its rights, and the settlement was allocated as follows.  PIIC and USF each paid $500,000 on their primary policies, for a total of $1 million in primary coverage.  Because PIIC valued the settlement at $3.7 million, it believed the excess amount to be $2.7 million.  PIIC thus paid the additional sum of $450,000 on the PIIC Excess Policy, which is one-sixth (based on the five-to-one ratio) of the $2.7 million excess.  RLI, valuing the settlement at $3.9 million, paid the remainder, which was $2.45 million.  RLI now seeks to recover from PIIC and USF a portion of the $2.45 million it paid to settle the *Tutt* Lawsuit.  All parties move for summary judgment.  Because they present

- 4 -

related questions, the court considers the motions together.[3]

## II

In its motion for summary judgment, RLI contends that Texas law[4] requires PIIC and USF each to contribute $1 million on its primary policy toward the *Tutt* Lawsuit settlement. RLI maintains that the PIIC Primary Policy and USF Policy obligate each to contribute its full limits. It posits that because the primary policies overlapped for 27 days in October 1999, the combined $2 million primary limits would not violate Texas' rule against stacking of consecutive coverage limits. RLI additionally asserts

---

[3]RLI filed a reply brief on September 9, 2005, to which it attached an appendix. In a September 12, 2005 order the court stated that it would not consider the reply appendix because it had been filed without leave of court. On September 15, 2005 RLI filed a motion for leave to file a reply appendix. The court denies the motion. Applying *Dethrow v. Parkland Health Hospital System*, 204 F.R.D. 102, 104 (N.D. Tex. 2001) (Fitzwater J.), the court concludes that RLI has not shown sufficient cause to file a reply appendix. Additionally, as the court explains *infra* at note 9, the material in the appendix—the docket sheet and pleadings filed in *Commercial Underwriters Insurance Co. v. Royal Surplus Lines Insurance Co.*, 345 F.Supp.2d 652 (S.D. Tex. 2004)—does not affect the court's decision because it need not address the issue to which the material relates.

On August 23, 2005 USF filed objections to, and moved to strike, the affidavit of Janna Robinson ("Robinson") that RLI submitted in support of its summary judgment motion. In its August 23, 2005 brief in opposition to RLI's motion, PIIC objected to Robinson's affidavit. Because the court has not relied on Robinson's affidavit in deciding the summary judgment motions, USF's and PIIC's objections are overruled, and USF's motion to strike is denied, as moot.

[4]The court decides these motions under Texas law. Although none of the parties has addressed choice-of-law issues, each party contends that it is entitled to summary judgment under Texas law.

- 5 -

that, even absent the 27-day overlap, its excess liability is not triggered until PIIC and USF have each exhausted its policy limits. RLI argues alternatively that PIIC has failed to pay the full amount required under the PIIC Excess Policy because it contributed one-sixth of $2.7 million in excess, rather than one-sixth of $2.9 million.

PIIC and USF move for summary judgment, contending that Texas law does not permit the primary policies to be stacked to achieve $2 million in primary policy liability. They also maintain that RLI's negligence and contribution claims fail as a matter of law and that RLI is not entitled to attorney's fees because it cannot prevail on its breach of contract claim. Finally, PIIC asserts that it was entitled to value the settlement at $3.7 million, which RLI concedes was reasonable, and therefore is not required to contribute one-sixth of the remainder.

III

The court first considers whether PIIC and USF must each contribute $1 million toward the settlement of the *Tutt* Lawsuit.

A

Whether the total primary policy limits in this case are $1 million or $2 million depends in part on whether the primary policies' coverage limits can be "stacked." The term "stacking" generally refers to one of two different categories: "(1) losses which occur across more than one policy period, . . . raising the

question whether the insured may 'stack' the limits of consecutive policies" and "(2) losses which occur at a specific time, but to which more than one policy coverage applies."  12 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 169:4 (3d ed. 1997).  In the first category, the Texas Supreme Court has adopted a rule against stacking, holding that "consecutive policies, covering distinct policy periods, [cannot] be 'stacked' to multiply coverage for a single claim involving indivisible injury." *Am. Phys. Ins. Exch. v. Garcia*, 876 S.W.2d 842, 853 (Tex. 1994).  But in the second category, stacking of coverage is permitted.  Under Texas law, "where there are multiple policies in effect for the same coverage period, those limits may be stacked." *Bethany Christian Church v. Preferred Risk Mut. Ins. Co.*, 942 F. Supp. 330, 337 (S.D. Tex. 1996) (applying Texas law); *see also* 12 Russ & Segalla, *supra*, § 169:13 ("Keeping in mind that the definition of 'stacking' means that two or more coverages must be otherwise applicable to a given loss, an insured should generally have the right to stack these coverages as long as stacking is not prohibited by any statute, regulation, unwritten public policy, or valid contract term."); 12 Russ & Segalla, *supra*, § 169:110 n.76 ("[I]f multiple policies are in effect for the same coverage period, those limits may be stacked.").

One of the fundamental differences the parties have concerns the stacking category into which this case falls.  RLI, focusing on

the 27-day period from October 1, 1999 to October 28, 1999 when the two policies briefly overlapped, contends the policy limits can be stacked.  It posits that BMW was entitled to $2 million in primary coverage during the overlap period and that, as BMW's subrogee, it is entitled to $2 million in primary coverage for the claim occurrence.  PIIC and USF maintain that the primary policies did not actually overlap because PIIC's 27-day coverage extension was not supported by consideration.  They also contend that, even if there was an overlap in coverage, it was inadvertent, and permitting $2 million in primary limits in an inadvertent-overlap case would violate Texas' rule against stacking of consecutive policy limits.  Finally, if the court does decide that the primary policies can be stacked during the 27-day overlap period, PIIC and USF maintain that the total primary coverage should be calculated pro-rata.

B

The court will first address PIIC and USF's argument that the policies did not actually overlap because PIIC's coverage extension was not supported by consideration.  "The general rule, which is followed in Texas, is that 'consideration is necessary for a valid modification of the coverage provisions of an insurance policy, whether the effect of the modification is to extend or limit the risks against which the contract affords protection.'"  *Radoff v. Utica Mut. Ins. Co.*, 510 S.W.2d 151, 154 (Tex. Civ. App. 1974, writ

ref'd n.r.e.) (quoting *Md. Cas. Co. v. First Nat'l Bank of Atlanta, Tex.*, 82 F.2d 465, 467 (5th Cir. 1936)).  The PIIC Primary Policy, for which there was valid consideration, provided, in pertinent part: "If notice [of non-renewal] is mailed or delivered less than 60 days before the expiration date, this policy will remain in effect until the 61st day after the date on which the notice is mailed or delivered."  USF Aug. 1, 2005 App. 15.[5]  The extension in coverage was thus dictated by the terms of the PIIC Primary Policy itself.  Moreover, it was statutorily required by Tex. Ins. Code Ann. art. 21.49-2A(e) (Vernon Supp. 1992) (repealed 2005).  *See Trinity Universal Ins. Co. v. Fid. & Cas. Co. of N.Y.*, 837 S.W.2d 202, 204-05 (Tex. App. 1992, no writ) (holding that insurance policy was automatically extended to 61st day after notice was mailed because notice was not mailed 60 days prior to expiration).  Thus no additional consideration was required, and both the PIIC Primary Policy and the USF Policy were in effect during the 27-day overlap period.

C

Because both primary policies were in effect at the same time during only a portion of the claim occurrence, this case is in a sense a hybrid of the two categories of stacking.  It fits within

---

[5]Because the parties have filed multiple appendixes in litigating these motions, the court will cite the appendix by the party who filed it and the date filed.

the first because the claim was for a single, indivisible injury[6] that occurred across more than one policy period. It also falls within the second because, during a portion of the claim period, more than one policy's coverage applied. The parties agree that Texas law is unsettled as to whether policy limits can be stacked in a case like this one. "The court must therefore make an *Erie*-guess as to how the Texas Supreme Court would decide the question." *Nutmeg Ins. Co. v. Pro-Line Corp.*, 836 F. Supp. 385, 388 (N.D. Tex. 1993) (Fitzwater, J.).

When making an *Erie*-guess, this court's task is to determine how the Texas Supreme Court would decide the question. *See, e.g., Batts v. Tow-Motor Forklift Co.*, 66 F.3d 743, 749 (5th Cir. 1995) (Fitzwater, J.). "While decisions of intermediate state appellate courts provide guidance, they are not controlling. If a state's highest court has not ruled on the issue in question, a federal

---

[6]The PIIC Primary Policy and USF Policy are "occurrence" policies that provide up to $1 million in coverage for each claim occurrence. The PIIC Primary Policy and USF Policy both define "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." USF Aug. 1, 2005 App. 95, 173. The parties have not explicitly stipulated that the conduct that caused Moore's injuries constituted only one occurrence. They have stipulated, however, that the *Tutt* Lawsuit alleged that BMW "provid[ed] a *continuing course* of substandard, improper care for Mr. Moore during the period of his residency at Westridge Manor." Stipulation of Facts 2 (emphasis added). Because the alleged continued course of improper care falls within the Policies' definition of "occurrence," the parties have implicitly agreed that the conduct complained of in the *Tutt* Lawsuit constituted one occurrence that extended over both policy periods.

court must determine, to the best of its ability, what the highest court of the state would decide." *United Teacher Assocs. Ins. Co. v. Union Labor Life Ins. Co.*, 414 F.3d 558, 565-66 (5th Cir. 2005) (citations omitted).  The court can consider treatises in making an *Erie*-guess.  *See Am. Indem. Lloyds v. Travelers Prop. & Cas Ins. Co.*, 335 F.3d 429, 435 (5th Cir. 2003).  It is not, however, this court's "role to create or modify state law, rather only to predict it."  *Batts*, 66 F.3d at 750.

D

In *Garcia* the Texas Supreme Court addressed the first category of stacking and held that "consecutive policies, covering distinct policy periods, could not be 'stacked' to multiply coverage for a single claim involving indivisible injury." *Garcia*, 876 S.W.2d at 853.  In *Garcia* the insured was a physician who had purchased three consecutive, non-overlapping malpractice policies.  *Id.* at 843. Each policy provided $500,000 in coverage per occurrence.  *Id.*  The insured physician was held liable for negligent conduct that extended throughout all three policy periods.  *Id.* at 845.  The extended period of negligence was "a single claim involving indivisible injury" and was thus one occurrence as defined by the insurance policies.  *Id.* at 853.

The insured physician argued that he was entitled to aggregate the policy limits of the individual policies to achieve $1.5

million in coverage.  *Id.* at 854.[7]   The Texas Supreme Court
rejected this argument, holding that the consecutive policies'
limits could not be stacked.  *Id.* at 854-55.  The court reasoned:

>       Simply because a "Claim Occurrence"
> extends throughout several policy periods does
> not raise the per-occurrence indemnity cap
> established in every policy . . . .
>
>       . . .
>
>       The . . . claim . . . rests on the
> assumption that Garcia had three times more
> insurance than he purchased.  At no time
> during the four relevant coverage years did
> any two policies overlap.  Thus, at no time
> during the four years did Garcia carry
> liability insurance with a per-occurrence
> limit greater than $500,000.  Garcia did not
> purchase malpractice insurance for $1.5
> million in coverage, as he might have done by
> purchasing excess or umbrella coverage, and
> therefore he may not claim to benefit from
> $1.5 million in coverage by stacking
> temporally distinct policies.

*Id.* at 853-55.

     The *Garcia* court also explained how to calculate the claim's
total coverage limits when different triggered policies had
different limits:

---

[7]In *Garcia* the "plaintiff" to whom the court referred was in
fact the plaintiffs who had sued the physician in a prior medical
malpractice suit.  They brought a lawsuit in the name of the
physician, as his assignees, to recover against the physician's
liability carriers for breaching the duty to defend and the *Stowers*
duty.  *See Garcia*, 876 S.W.2d at 845.

> If a single occurrence triggers more than one policy, covering different policy periods, then different limits may have applied at different times.  In such a case, the insured's indemnity limit should be whatever limit applied at the single point in time during the coverage periods of the triggered policies when the insured's limit was highest. . . . Once the applicable limit is identified, all insurers whose policies are triggered must allocate funding of the indemnity limit among themselves according to their subrogation rights.

*Id.* at 855; *accord Keene Corp. v. Ins. Co. of N. Am.*, 667 F.2d 1034, 1049-50 (D.C. Cir. 1981) ("Keene may select the policy under which it is to be indemnified.").

### E

*Garcia* is not directly on point with the facts of this case because the insurance policies in *Garcia* were consecutive and non-overlapping, whereas the primary policies here overlapped for 27 days.  The parties disagree, however, about the effect of *Garcia* on this case.  RLI posits that under *Garcia* the primary policy limits are whatever primary limits applied at the single point in time when the limits were the highest——here, $2 million.  PIIC and USF maintain that, although *Garcia* is not directly on point, its rationale suggests that stacking is prohibited in the case of an "inadvertent" overlap.

The court begins by examining the 27-day overlap period in isolation.  Had the claim occurred entirely within the overlap period, the case would have lain squarely within the second

stacking category because the claim would have occurred entirely during a period when more than one primary policy's coverage applied.  BMW would have been entitled to stack the primary limits to achieve $2 million in primary coverage.  *See Bethany Christian Church*, 942 F. Supp. at 337; 12 Russ & Segalla, *supra*, §§ 169:13, 169:110 n.76.   As BMW's subrogee, RLI would have the same entitlement.  Hence, RLI's assertion that the primary policy limits can be stacked during the overlap period is correct.   Prior to October 1, 1999 BMW's primary limits were $1 million; from October 1, 1999 to October 28, 1999 BMW's primary limits were $2 million; and on and after October 28, 1999 BMW's primary limits were again $1 million.

The court next addresses the effect of the overlap period's $2 million primary coverage limits.  *Garcia* held that "the insured's indemnity limit should be whatever limit applied at the single point in time during the coverage periods of the triggered policies when the insured's limit was highest."  *Garcia*, 876 S.W.2d at 855. RLI relies on this portion of *Garcia* to assert that since the primary limits during the overlap period were $2 million, BMW was entitled to $2 million in primary coverage for the entire claim. But *Garcia* is not directly on point because this statement of law expressly applies when "a single occurrence triggers more than one policy, covering *different* policy periods."  *Id.* (emphasis added). Here, the policy periods overlapped.

PIIC and USF maintain that, although the policies overlapped for 27 days, the overlap in coverage was inadvertent and an unintended consequence of PIIC's extension of coverage. They emphasize that BMW did not request or pay any additional premium for the coverage extension and that PIIC provided the extension on its own initiative to ensure that BMW had sufficient time to acquire replacement coverage. PIIC and USF contend that *Garcia*'s rationale compels the conclusion that the PIIC Primary Policy and USF Policy cannot be stacked. They focus on a portion of the opinion that rejects the idea that an insured can get more out of the insurance contract than he bargained for: "Garcia did not purchase malpractice insurance for $1.5 million in coverage, as he might have done by purchasing excess or umbrella coverage, and therefore he may not claim to benefit from $1.5 million in coverage by stacking temporally distinct policies." *Id.* at 854-55.

PIIC and USF's argument is misplaced. *Garcia* was decided wholly within the context of consecutive, non-overlapping coverage. Nothing in the opinion purports to address stacking in the context of overlapping coverage. Moreover, although *Garcia* may reasonably be read to stand for the proposition that an insured cannot get more than it bargained for from an insurance contract, *see Lafarge Corp. v. Hartford Cas. Ins. Co.*, 61 F.3d 389, 404 (5th Cir. 1995), in the instant case BMW did not get more. It purchased $1 million in primary coverage from PIIC for the period October 1, 1998 to

- 15 -

October 1, 1999.  PIIC extended the coverage to October 28, 1999 to give BMW 60 days' notice of non-renewal.  Because PIIC did not charge a premium for the coverage extension, BMW did not need to do anything to maintain its $1 million in primary coverage from October 1, 1999 to October 28, 1999.  BMW bargained for additional coverage from USF when it added Westridge as a covered facility on the USF Policy beginning October 1, 1999 rather than waiting until October 28, 1999.  BMW did not pay nothing for $1 million in coverage during this period; it paid USF a premium, resulting in a total of $2 million in coverage for 27 days.

Although *Garcia* does not directly support either side's position, it does inform this court's conclusion.  Consider the following hypothetical: What would have been the primary policy limits in the instant case had the occurrence triggered three consecutive, non-overlapping primary policies: a $1 million primary policy, followed by a $2 million primary policy, followed by another $1 million primary policy?  In that situation, BMW's primary limits would have been "whatever limit applied at the single point in time during the coverage periods of the triggered policies when the insured's [primary] limit was highest." *Garcia*, 876 S.W.2d at 855; *see also CNA Lloyds of Tex. v. St. Paul Ins. Co.*, 902 S.W.2d 657, 660 ("[T]he total coverage available must be the highest liability limit available under any of the multiple policies covering the claim.").  BMW would have been entitled to $2

million in primary limits for the entire claim occurrence, and it would have been entitled to these limits regardless of how long the $2 million policy was in effect, even if it was in effect for only 27 days.

The facts of the instant case, although not literally equivalent, are analogous to this hypothetical. The coverage period in this case can be viewed for analytical purposes as three consecutive, non-overlapping periods: a period with $1 million limits, followed by a period with $2 million limits, followed by another period with $1 million limits. BMW's single, indivisible claim is thus entitled to $2 million in primary limits——the limits that applied at the single point in time when BMW's primary limits were highest. *See Garcia*, 876 S.W.2d at 855; *CNA Lloyds*, 902 S.W.2d at 660.

F

PIIC's alternative argument that the $2 million stacked limits should be prorated is also misplaced. PIIC contends that, if the court concludes the primary policies can be stacked during the 27-day overlap period, the court should calculate the claim's primary-coverage limits on a pro-rata basis. PIIC calculates the prorated primary limits as follows. For 348 of the 375 days of Moore's residency at Westridge, BMW's primary limits were $1 million; for the remaining 27 days, they were $2 million. The weighted average of BMW's primary limits during Moore's residency were thus

$1,072,000,[8] which would be the prorated policy limits. PIIC maintains that it and USF are at most responsible for an equal share of the additional $72,000.

PIIC concedes that no authority exists for its proffered pro-rata approach. Indeed, Texas intermediate courts have rejected this method of calculating an insurer's liability both for its duty to indemnify and its duty to defend. *See Tex. Prop. & Cas. Ins. Guar. Ass'n v. Sw. Aggregates, Inc.*, 982 S.W.2d 600, 605 (Tex. App. 1998, no pet.); *CNA Lloyds*, 902 S.W.2d at 661. This conclusion is entirely consistent with *Garcia*, which did not hold that the insured's liability limits are calculated on a pro-rata basis, but concluded that the limits are "whatever limit applied at the single point in time during the coverage periods of the triggered policies when the insured's limit was highest." *Garcia*, 876 S.W.2d at 855.

Texas intermediate courts have adopted the approach set out by the D.C. Circuit in *Keene*. *See Sw. Aggregates*, 982 S.W.2d at 605. *Keene* was an asbestos liability case where the insured asbestos manufacturer was covered by multiple, consecutive CGL policies. *See Keene*, 667 F.2d at 1038. The *Keene* court rejected an insurer's argument for proration of its liability based on its time on the risk. *Id.* at 1047-48. The court interpreted the policies as the insurers' promises of certainty to the insured, focusing on the insured's reasonable expectations. *Id.* It held

---

[8]($1,000,000 x 348 + $2,000,000 x 27) ÷ 375 = $1,072,000

that once a particular insurer's coverage is triggered, that insurer is liable to the insured to the "full extent" of the insured's liability up to its policy's limits, subject to "other insurance" clauses.  *Id.* at 1048.  The court reasoned: "There is nothing in the policies that provides for a reduction of the insurer's liability if an injury occurs only in part during a policy period.  As we interpret the policies, they cover [the insured's] *entire* liability once they are triggered."  *Id.* (emphasis added); *accord CNA Lloyds*, 902 S.W.2d at 661.  Moreover, "[f]or an insurer to be only partially liable for an injury that occurred, in part, during its policy period would deprive [the insured] of insurance coverage for which it paid." *Keene*, 667 F.2d at 1049.

In predicting how the Texas Supreme Court would decide this question, this court holds that it would attempt to follow and apply known principles of Texas insurance law and thereby promote predictability and certainty rather than potentially undermine settled contractual expectations.  These established principles recognize that the correlative responsibilities of insurers on the same risk are typically governed by contract——e.g., "other insurance" clauses——rather than by common law doctrines. *See Sw. Aggregates*, 982 S.W.2d at 605 ("[O]nce coverage under an insurance policy is triggered, an insurer is liable up to its policy limits, subject to 'other insurance' clauses.") (quoting *Keene*, 667 F.2d at

- 19 -

1047-48); *see also Garcia*, 876 S.W.2d at 855 ("Once the applicable limit is identified, all insurers whose policies are triggered must allocate funding of the indemnity limit among themselves according to their subrogation rights."). Therefore, the court predicts that the Texas Supreme Court would not adopt a common law pro-rata allocation rule that, even if found to be desirable, should be addressed by contract. Because this court is not convinced that the Texas Supreme Court would decide the question otherwise, it follows the guidance of the Texas intermediate courts of appeals that have rejected a pro-rata rule.

G

In the instant case, even if the 27-day overlap period was inadvertent and temporally brief in relation to the duration of the claim occurrence, BMW by contract had $2 million in primary coverage during the 27-day period because both $1 million primary policies were in effect. PIIC and USF each contracted to insure BMW for up to $1 million from October 1, 1999 to October 28, 1999, yielding a total of $2 million in primary coverage. It is irrelevant that the injury occurred only in part during the period when there was $2 million in coverage. Nothing in either primary policy provides for a reduction of an insurer's liability if an injury occurs only in part during a policy period. *Cf. CNA Lloyds*, 902 S.W.2d at 661 ("[T]he insurance policies . . . do not provide for a reduction of the insurer's liability limits if an injury only

partially occurs during a policy period.  Instead, both policies contract to pay the sums the insured becomes legally obligated to pay, not merely a pro rata portion of that amount.").  PIIC and USF are liable for BMW's claim up to their primary policies' limits, subject to their policies' "other insurance" clauses.

Allocating the $2 million in liability between two triggered primary policies is straightforward in this case.  The court need not analyze the policies' "other insurance" clauses because both primary policy limits must be exhausted in light of the amount of the *Tutt* settlement.

H

PIIC and USF argue that requiring them each to contribute $1 million toward the settlement would result in inequitable results or a windfall for BMW (or for RLI as its subrogee).  *Keene* rejected a similar argument, and the court predicts that the Texas Supreme Court would as well.

In *Keene* an insurer posited that rejecting the pro-rata approach would allow the insured "to enjoy the benefits of insurance coverage which it has never paid for." *Keene*, 667 F.2d at 1049 (internal quotation marks omitted).  *Keene* rejected this premise, explaining that "The contrary point . . . is more accurate: For an insurer to be only partially liable for an injury that occurred, in part, during its policy period would deprive [the insured] of insurance coverage for which it paid." *Id.*

Moreover, PIIC and USF should not be surprised that they must each indemnify BMW for $1 million.  Each insurer agreed to accept a premium in exchange for the risk of exposure up to $1 million; this is the very nature of CGL coverage.  Under *Keene*, had the entire claim occurred within one insurer's policy limits, that single insurer would have been liable for the full $1 million.  Had BMW not added Westridge to its USF Policy at all, PIIC would have been liable for $1 million in coverage, notwithstanding that PIIC's Primary Policy was in effect for only part of the injury period. *See id.* at 1048-49.  And had the Westridge facility been uninsured before the USF Policy went into effect on October 1, 1999, USF would nevertheless have been liable up to its full $1 million limit. *See id.*  Each insurer understood that it could be liable up to $1 million.

Additionally, PIIC and USF could in various ways have prevented the coverage overlap that occurred in this case.  The most obvious starting point is PIIC, who could have provided BMW timely notice of non-renewal.  USF could have made it a contractual condition of coverage that Westridge not be insured by any other primary CGL policy.  Either insurer could have dealt with this situation in its policy's "other insurance" clause. *See CNA Lloyds*, 902 S.W.2d at 661 ("[I]nsurer is liable up to its policy limits, *subject to 'other insurance' clauses.*") (emphasis added) (quoting *Keene*, 667 F.2d at 1048).  For example, either insurer

- 22 -

could have included an "escape" clause, which provides that the insurer is not liable if the insured has other insurance. *See Hardware Dealers Mut. Fire Ins. Co. v. Farmers Ins. Exch.*, 444 S.W.2d 583, 586 (Tex. 1969). PIIC and USF's failure to draft their policies' "other insurance" clauses to address this situation does not render this result inequitable.

I

Finally, PIIC and USF's argument that RLI's excess coverage was triggered at $1 million in liability is misplaced. PIIC and USF point to the fact that BMW scheduled only $1 million in underlying insurance on the RLI Policy, contending that BMW bargained for RLI's Policy to trigger at $1 million rather than $2 million. But the RLI Policy specifically provides coverage only "for the ultimate net loss in excess of . . . the applicable limits of scheduled underlying insurance . . . *plus* the limits of any *unscheduled* underlying insurance." USF Aug. 1, 2005 App. 205 (emphasis added). The majority rule, which Texas follows, is

> that where an umbrella policy provides coverage for a loss in excess of the underlying policies listed in its schedule and in excess of the applicable limits of any other underlying insurance collectible by the insured, all such other collectible insurance must be exhausted before liability attaches under the umbrella policy.

*Carrabba v. Employers Cas. Co.*, 742 S.W.2d 709, 715 (Tex. App. 1987, no writ); *see also St. Paul Mercury Ins. Co. v. Lexington Ins. Co.*, 78 F.3d 202, 209 (5th Cir. 1996) ("Texas law dictates

- 23 -

that primary policies' limits must be exhausted before excess insurers become liable."). Regardless of the scheduled insurance, RLI's Policy was not triggered in this case until the limits of both the PIIC Primary Policy and the USF Policy were exhausted.[9]

IV

The court now turns to RLI's alternative argument that PIIC has not paid the full amount required under the PIIC Excess Policy.

In its August 3, 2005 brief in support of its motion for summary judgment, RLI explains that it seeks recovery for underpayment on the PIIC Excess Policy "[i]n the alternative, and only in the unlikely event that the Court should conclude that [PIIC] and USF are correct concerning their obligations under the Primary Policies." RLI Aug. 3, 2005 Br. 16. In light of the court's conclusion that PIIC and USF must contribute the full limits of their primary policies, RLI explicitly disclaims recovery under this theory, and the court holds that the claim has been relinquished.

_____

[9]RLI also contends that, even if the PIIC Primary Policy and the USF Policy had not been overlapping, its excess liability would not have been triggered until both primary policy limits were exhausted, i.e., until the primary insurers contributed a total of $2 million. PIIC and USF respond, *inter alia*, that RLI's position is inconsistent with *Commercial Underwriters*, 345 F.Supp.2d 652, while RLI maintains that *Commercial Underwriters* is inapposite. Although the parties have presented substantial briefing on this question, the court need not address it because it agrees with RLI's principal contention that the primary policy limits in this case are $2 million.

V

The court now considers whether PIIC and USF are entitled to summary judgment dismissing RLI's claims for contribution and negligence.

A

Under Texas law, if an excess insurer pays more than its share to settle a lawsuit against the insured because a primary carrier did not contribute its obligated amount, the excess insurer can recover its overpayment from the primary insurer in a subrogation action. *See Am. Centennial Ins. Co. v. Canal Ins. Co.*, 843 S.W.2d 480, 483 (Tex. 1993) ("[A]n excess carrier may bring an equitable subrogation action against the primary carrier."). RLI paid BMW $1 million that PIIC and USF were obligated to pay, and RLI can recover this amount as subrogee to BMW's rights. RLI stands in BMW's shoes—i.e., RLI can assert any claim that BMW could have asserted directly, and it is subject to any defense that could have been raised against BMW. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. John Zink Co.*, 972 S.W.2d 839, 844 (Tex. App. 1998, pet. denied) ("The subrogees stand in the shoes of the one whose rights they claim, and the extent of the subrogees' remedy and the measure of their rights are controlled by those possessed by the subrogor.").

RLI sues for equitable and/or contractual subrogation and contribution, breach of contract, and negligence for the primary

insurers' failures to pay under their policies.  In its complaint, RLI does not bring its negligence claim directly.  Instead, it sues as BMW's subrogee.  BMW would have been entitled to seek relief against PIIC and USF, but its claim would have sounded only in contract for their failures to perform fully under the insurance contracts, not in negligence.[10]  The court therefore grants summary judgment dismissing RLI's negligence claim, and denies summary judgment in RLI's favor on this claim.

### B

Although the complaint enumerates one cause of action for "subrogation and contribution," Compl. § V, these are in fact two distinct theories of recovery.  Subrogation is not a direct claim; it is a contractual or equitable conduit through which a party, standing in the shoes of the subrogor, may assert the subrogor's claims.  In contrast, contribution is a direct cause of action whereby a party against whom judgment has been rendered can seek contribution from other codefendants against whom judgment has also been rendered.  *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 32.002,

---

[10]Texas does recognize one type of negligence claim brought by an insured against its insurer.  An insured may bring a *Stowers* action for the insurer's negligent failure to settle.  But *Stowers* is inapplicable to the facts of this case.  An insurer's *Stowers* duty is its duty "to exercise ordinary care in the settlement of claims to protect its insureds against judgments in excess of policy limits."  *Garcia*, 876 S.W.2d at 843 n.2.  In this case, there could have been no breach of an insurer's *Stowers* duty because each insurer settled the *Tutt* Lawsuit.  There was no judgment in excess of policy limits.

33.015(a) (Vernon 1997).  "[A] defendant can settle only his proportionate share of a common liability and cannot preserve contribution rights under either the common law or the comparative negligence statute by attempting to settle the plaintiff's entire claim."  *Beech Aircraft Corp. v. Jinkins*, 739 S.W.2d 19, 22 (Tex. 1987).

In this case, no judgment was rendered against any of the *Tutt* Lawsuit defendants.  Moreover, RLI did not preserve its contribution rights because it settled the entire *Tutt* Lawsuit. The court thus grants PIIC and USF summary judgment on RLI's contribution claim and denies RLI summary judgment in its favor on this claim.

*     *     *

Accordingly, the court grants in part and denies in part RLI's August 1, 2005 motion for summary judgment, and it denies RLI's September 15, 2005 motion for leave to file an appendix in support of its reply brief.  The court grants in part and denies in part PIIC's August 1, 2005 motion for summary judgment, and it grants in part and denies in part USF's August 1, 2005 motion for summary judgment.  USF's and PIIC's August 23, 2005 objections are overruled, and USF's August 23, 2005 motion to strike is denied, as moot.  The court holds that RLI, as subrogee, is entitled to judgment against PIIC for $500,000, plus prejudgment interest, for breach of contract, and to judgment against USF for $500,000, plus

prejudgment interest, for breach of contract.   RLI may apply for an award of attorney's fees and costs under the procedures specified in Rule 54(d) and N.D. Tex. Civ. R. 54.1.   The court will file today a judgment that reflects the foregoing decision.   All other relief sought by any party is denied.

       **SO ORDERED.**

March 15, 2006.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE

- 28 -